**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

**DANIEL A.**,

*Plaintiff*,

v.

**COMMISSIONER OF SOCIAL SECURITY,**

*Defendant*.

---

No. 1:25-cv-14847

**OPINION**

**APPEARANCES:**

Alan Harris Polonsky
POLONSKY & POLONSKY
512 S. White Horse Pike
Audubon, NJ 08106

*On behalf of Plaintiff.*

Andrew Charles Lynch
SOCIAL SECURITY ADMINISTRATION
LAW & POLICY, PROGRAM LITIGATION 3
6401 Security Blvd.
Baltimore, MD 21235

*On behalf of Defendant.*

**O'HEARN, District Judge.**

This matter comes before the Court on an appeal by Plaintiff Daniel A.[1] ("Plaintiff") from a denial of Social Security disability benefits by the Commissioner of Social Security ("Commissioner"). (ECF No. 1). The Court did not hear oral argument pursuant to Local Rule 78.1. For the reasons that follow, the Court **AFFIRMS** the Commissioner's decision.

## I. BACKGROUND

The Court recites herein only those facts necessary for its determination of this appeal.

### A. Administrative History

On June 27, 2023, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging a disability onset date of March 10, 2023. (AR 144–50). The application was denied initially on October 20, 2023, (AR 87–90), and upon reconsideration on April 10, 2024. (AR 100–02). Plaintiff subsequently filed a written request for a hearing before an ALJ on April 23, 2024. (AR 103–05). The ALJ held a hearing by audio only on December 4, 2024, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert ("VE"). (AR 33–63). In a decision dated January 29, 2025, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (AR 14–32). The decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on July 18, 2025. (AR 1–6). Plaintiff timely filed this appeal on August 22, 2025, pursuant to 42 U.S.C. § 405(g). (ECF No. 1).

[1] Pursuant to this Court's Standing Order 2021-10, this Opinion will refer to Plaintiff solely by his first name and last initial.

**B. Plaintiff's Background and Testimony**

At the alleged onset of disability, Plaintiff was 55 years old and living with his wife in New Jersey. (AR 40–41; AR 144–45). Plaintiff graduated from high school in 1986 and has no other education or vocational training. (AR 204). From May 2011 through July 2021, Plaintiff worked in security at Universal Protection Service. (AR 238, 244). His physical tasks involved sitting, standing, and walking for eight hours a day and lifting up to ten pounds at any time. (*Id.*). From July 2021 through December 2021, Plaintiff worked in retail sales at Walmart. (AR 238, 243). From December 2021 through March 2023, Plaintiff worked in retail sales at Home Depot. (AR 238, 242). In those jobs, Plaintiff's physical tasks involved stocking shelves, operating heavy equipment, and lifting up to 100 pounds at a time. (AR 238, 242–43). Though it was not reported in Plaintiff's work history report, (AR 238–48), Plaintiff also testified that he was employed by FedEx. (AR 41). Plaintiff testified that he did not typically lift any weight in that job. (AR 41–42).

Plaintiff's initial application identified the following illnesses, injuries, or conditions: pacemaker, lightheadedness and dizziness, depression, memory issues, asthma, and hearing loss. (AR 64). At the administrative hearing, Plaintiff alleged that his episodic lightheadedness and dizziness prevented him from working. (AR 42). Plaintiff also claimed that he had memory loss. (AR 43–44, 48). Plaintiff has a pacemaker but reports that it does not alleviate his symptoms. (AR 44). Plaintiff also takes meclizine but reports that it does not alleviate his symptoms. (AR 45–46).

Plaintiff testified that he tripped while doing yard work and broke his ankle in May of 2024. (AR 49). He testified that, before this fall, yard work was something that he enjoyed doing. (*Id.*). Plaintiff testified that, even before his fall, he had trouble walking more than a block without needing to stop and rest. (AR 51). Plaintiff further testified that he now walks with a cane. (AR

44–45).

**C. Plaintiff's Pertinent Medical History**

Plaintiff has been examined by numerous medical professionals over the years and during the pendency of his disability claim. The Court will briefly summarize the relevant medical evidence for purposes of this appeal. This recitation is not comprehensive.

1. Inspira Medical Center Vineland

In March 2023, Plaintiff presented to the Emergency Department at Inspira Medical Center Vineland for complaints of intermittent episodes of dizziness. (AR 309–57). Plaintiff underwent a computed tomography ("CT") scan of the chest and an ultrasound examination of the carotid vasculature. (AR 354–56). Dr. Riten Jana determined that "some subtle ground-glass density in the right upper lobe somewhat Peri bronchial in location could reflect a small focus of alveolitis or pneumonitis." (AR 354). Plaintiff was diagnosed with hypertension and symptomatic bradycardia. (AR 319, 324). Plaintiff was then transferred to Penn Presbyterian where he received a pacemaker. (AR 363); *see also infra* Section I.C.2.

In April 2023, Plaintiff once again presented to the Emergency Department at Inspira. (AR 363). He again complained of ongoing intermittent dizziness. (*Id.*). He was discharged with a prescription of meclizine to be taken every twelve hours as needed for dizziness and a referral for neurological testing. (AR 363–65).

2. Penn Presbyterian Medical Center and Penn Cardiology

On March 14, 2023, Plaintiff underwent a cardiac electrophysiology procedure to install a dual-chamber pacemaker. (AR 680–82). After his April emergency room visit at Inspira, *see supra* Section I.C.1, Dr. Dimitrios Barmpouletos reviewed Plaintiff's file and noted that his symptoms of dizziness showed "no clear association" with his pacemaker. (AR 476).

In August 2023, Plaintiff was seen for continued pacemaker management at the Penn Cardiology Electrophysiology Clinic. (AR 1139). Plaintiff reported that he had been experiencing dizzy episodes for two weeks. (*Id.*). A stress test revealed no evidence of infarct or regadenoson-induced ischemia. (AR 1141). Plaintiff also reported that he had decreased his coffee consumption from a pot a day to three to four cups a day. (AR 1139).

In November 2023, Plaintiff was again seen at the Penn Cardiology Electrophysiology Clinic for continued pacemaker management. (AR 1155–58). At this visit, Plaintiff reported continued episodic dizziness, occurring up to 5 times per day. (AR 1155). In describing his dizziness, Plaintiff reported that "[s]ometimes the event is over within a minute and sometimes it takes 30 minutes to 1 hour to feel improved." (*Id.*).

In December 2023, Plaintiff was seen by Dr. Barmpouletos for follow-up. (AR 1151). Plaintiff stated that he continued to have "occasional dizziness." (*Id.*). Plaintiff's visit record lists obesity as one of his medical issues. (AR 1151–55).

3. <u>Dr. Vipin Gupta</u>

Later in April 2023, Plaintiff was seen by Dr. Vipin Gupta for a neurological evaluation. (AR 464–68). Dr. Gupta observed that Plaintiff experienced a motor vehicle accident in 1986 that resulted in a head injury requiring a burr hole placement. (AR 466). Following the accident, Plaintiff was in a coma for approximately six to eight weeks but had no residual physical problems associated with the accident. (*Id.*). Dr. Gupta also noted that Plaintiff used to drink twelve cups of coffee daily but reduced his intake to three or four cups daily after his permanent pacemaker was installed. (AR 466). Dr. Gupta concluded that Plaintiff's tests and lab results were normal and that the dizziness was of "undetermined etiology." (AR 467–68). Dr. Gupta recommended that Plaintiff continue the meclizine treatment as needed. (AR 468).

In August 2023, Plaintiff was again evaluated by Dr. Gupta. (AR 933–34). Dr. Gupta determined that Plaintiff's MRI and EEG results were normal and maintained that the reported intermittent dizziness and lightheadedness were of unknown etiology. (AR 934).

4. Virtua Cardiology Group

In June 2024, Plaintiff was seen by Dr. Joshua Crasner at Virtua Cardiology Group. (AR 1178–83). Plaintiff reported experiencing ongoing dizziness and lightheadedness for more than a year. (AR 1178). In July 2024, Plaintiff was seen by Dr. Slvaraman Yegya-Raman for an electrophysiology evaluation to check his pacemaker functionality. (AR 1184–89).

5. Inspira Medical Center Mullica Hill

In July 2023, Plaintiff presented to Inspira Medical Center Mullica Hill with complaints of a cough and shortness of breath. (AR 924). The ambulatory medical records note that Plaintiff reported he felt "much better overall" since the placement of his pacemaker. (AR 924). Plaintiff's BMI was noted to be 35.19 $kg/m^2$ but this fact was not commented on by the treating physician. (AR 925). Plaintiff was prescribed nasal spray and an inhaler. (AR 924).

6. Dr. Emily Sussman, Cooper University Health Care

In addition to his specialist care, Plaintiff routinely visited his primary care physician, Dr. Emily Sussman, at Cooper University Health Care. (AR 983–1125, 1201–18). Plaintiff consistently reported symptoms of dizziness. (AR 995, 1023, 1044, 1068, 1205). On June 25, 2024, Dr. Sussman advised Plaintiff that he had pre-diabetes and recommended a healthy diet and exercise. (AR 1205). Plaintiff noted at one visit in December 2023 that he had been on a cruise the previous week. (AR 994). At a June 2024 visit, Plaintiff reported that he fractured his foot after a fall in the yard, but his treatment notes reported that his gait was intact. (AR 1201).

7. Dr. Farhad Foroudi

In November 2023, Plaintiff was seen by Dr. Farhad Foroudi, a podiatrist. (AR 973–76). He was diagnosed with Achilles tendonitis and was fitted for a walking boot to be worn while ambulating. (AR 975). Dr. Foroudi reported that the device was "comfortable when fitted" and that Plaintiff was "able to ambulate without distress." (*Id.*). At the time of his visit, Plaintiff's weight was 263 pounds with a BMI of 35.67 kg/m$^2$. (AR 974). Dr. Foroudi did not comment on Plaintiff's weight or BMI in his report. (AR 973–76).

8. Premier Orthopaedic Associates

In May 2024, Plaintiff presented to Premier Orthopaedic Associates for pain in his right foot. (AR 1174–77). At his visit, he reported that he "got dizzy, lost his balance, and fell at home." (AR 1174). Plaintiff was diagnosed with a fifth metatarsal fracture and prescribed a walking boot. (AR 1176). At the time of his visit, Plaintiff's weight was 260 pounds with a BMI of 35.26 kg/m$^2$. (AR 1175). The treating physician noted that Plaintiff's BMI was elevated and informed Plaintiff that his elevated BMI posed an "increased risk for cardiovascular disease and aggravation of orthopedic conditions." (AR 1176).

9. Virtua Health Reconstructive Orthopedics

In October 2024, Plaintiff presented to Virtua Health Reconstructive Orthopedics for bilateral knee pain. (AR 1219–23). Plaintiff had a left knee arthroplasty in 2018 with no reported post-operative complications. (AR 1219). Plaintiff reported recently experiencing knee pain in both knees and was noted to use a cane. (*Id.*). No diagnosis was reported in the visit summary. (AR 1221 ("No diagnosis found.")). The physician reported that the musculoskeletal exam performed in the office revealed that Plaintiff had stability in both knees and active motion from 0 to 120 degrees in the right knee and 0 to 110 degrees in the left knee. (AR 1241).

10. Dr. Rodolfo Diaz

In September 2023, Plaintiff was seen for an otolaryngological evaluation by Dr. Rodolfo Diaz. (AR 948–51). Dr. Diaz diagnosed Plaintiff with bilateral sensorineural hearing loss and recommended use of hearing aids. (AR 950). Dr. Diaz also recommended evaluation by a neurologist to rule out central vertigo. (*Id.*). At the time of his appointment, Plaintiff was 256 pounds with a BMI of 34.72 kg/m$^2$. (AR 949). Dr. Diaz provided BMI counseling and recommended evaluation with a primary care physician for "abnormal BMI." (AR 950).

**D. Testimony of Vocational Expert**

Daniel Myers, the VE, testified at the December 4, 2024 hearing. (AR 56–61). The VE classified Plaintiff's past relevant work as a chief guard as light, skilled work with an SVP of 6. (AR 56). The VE classified Plaintiff's past work as a stock clerk as heavy (medium as performed by Plaintiff), semi-skilled work with an SVP of 4. (*Id.*). The VE classified Plaintiff's other past work as a composite of customer service clerk, which is light, semi-skilled work with an SVP of 4, industrial truck operator, which is medium, semi-skilled work with an SVP of 3, and stock clerk, which is heavy, semi-skilled work with an SVP of 4. (AR 56–57).

The ALJ asked the VE to consider an individual of Plaintiff's age, education, and work experience who could perform medium exertional work with no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; and no work with hazards such as unprotected heights or dangerous moving machinery such as saws, blades, and grinders. (AR 57). The VE testified that such an individual could perform Plaintiff's past relevant work as a customer service clerk and a stock clerk as actually performed. (AR 57–58). The ALJ ultimately found that Plaintiff could perform his past relevant work as a chief guard and stock clerk. (AR 26). The VE further testified that such an individual could perform other jobs in the national economy such as a laundry

worker, kitchen helper, or washer. (AR 57).

The ALJ also asked about additional limitations. The VE testified that an individual limited to sedentary exertional work would not be able to perform Plaintiff's past work. (AR 58). Plaintiff's counsel then asked the VE about the scope of medium work. (AR 59). The VE testified that medium work typically requires an individual to be on their feet all day. (*Id.*).

## II. LEGAL STANDARD

### A. Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000) (citing 42 U.S.C. § 405(g)). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations, quotation marks, and alterations omitted); *see also Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting *de novo* might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986) (citations omitted); *see, e.g., Fargnoli v. Halter*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided

the factual inquiry differently.") (citation omitted).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018) (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997)). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Hum. Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000)).

B. <u>Sequential Evaluation Process</u>

The Commissioner of the Social Security Administration has promulgated a five-step, sequential analysis for evaluating a claimant's disability, as outlined in 20 C.F.R. § 404.1520(a)(4)(i)–(v). The analysis proceeds as follows:

> At step one, the ALJ determines whether the claimant is performing "substantial gainful activity[.]" If he is, he is not disabled. Otherwise, the ALJ moves on to step two.
>
> At step two, the ALJ considers whether the claimant has any "severe medically determinable physical or mental impairment" that meets certain regulatory

> requirements. A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" If the claimant lacks such an impairment, he is not disabled. If he has such an impairment, the ALJ moves on to step three.
>
> At step three, the ALJ decides "whether the claimant's impairments meet or equal the requirements of an impairment listed in the regulations[.]" If the claimant's impairments do, he is disabled. If they do not, the ALJ moves on to step four.
>
> At step four, the ALJ assesses the claimant's "residual functional capacity" ("RFC") and whether he can perform his "past relevant work." A claimant's "[RFC] is the most [he] can still do despite [his] limitations." If the claimant can perform his past relevant work despite his limitations, he is not disabled. If he cannot, the ALJ moves on to step five.
>
> At step five, the ALJ examines whether the claimant "can make an adjustment to other work[,]" considering his "[RFC,] . . . age, education, and work experience[.]" That examination typically involves "one or more hypothetical questions posed by the ALJ to [a] vocational expert." If the claimant can make an adjustment to other work, he is not disabled. If he cannot, he is disabled.

*Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201–02 (3d Cir. 2019) (internal citations and footnote omitted) (alterations in original).

## III. SUMMARY OF THE ALJ'S FINDINGS

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (AR 19). At step two, the ALJ found Plaintiff had severe impairments of sick sinus syndrome, bradycardia, bifascicular block, asthma, obesity, and history of knee replacement. (AR 19 (citing 20 C.F.R. § 404.1520(c))). The ALJ noted that the record also documented medically determinable impairments that either "did not persist for more than 12 months or that do not cause more than minimal symptoms or limitations and are therefore not severe," including mild to moderate sensorineural hearing loss, Achilles tendonitis, and fracture of the fifth metatarsal of his right foot. (AR 20). The ALJ found that although Plaintiff was "noted to be obese, [] no treatment provider has indicated that he experiences symptoms or functional limitations due to elevated weight, either alone or in combination with his other impairments."

(AR 20).

The ALJ also found Plaintiff had medically determinable impairments of depression and anxiety disorder. (AR 20). To determine severity of his depression and anxiety disorder impairments, the ALJ considered "the broad functional areas of mental functioning set out in the disability regulations." (AR 20). In all four functional areas, the ALJ found Plaintiff had mild limitations. (AR 20–21). The ALJ concluded "[b]ecause the [Plaintiff's] medically determinable mental impairments cause no more than 'mild' limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the [Plaintiff's] ability to do basic work activities, they are nonsevere." (AR 20 (citing 20 C.F.R. § 404.1520a(d)(1))) (emphasis in original).

At step three, the ALJ found Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (AR 21 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526)). As such, the ALJ made the following RFC finding:

> [T]he [Plaintiff] has the residual functional capacity to perform medium work as defined in [20 C.F.R. § 404.1567(c)] except he can never climb ladders, ropes, and scaffolds. He can occasionally climb ramps and stairs. He must avoid hazards such as unprotected heights and dangerous, moving machinery such as saws, blades, and grinders.

(AR 22). In making the above determination, the ALJ considered Plaintiff's symptoms and their consistency with the evidence, medical and otherwise. (AR 22). The ALJ followed a two-step process. First, the ALJ determined whether there was an underlying impairment, physical or mental, that can be shown by medically acceptable clinical or laboratory diagnostic techniques and which could reasonably be expected to produce Plaintiff's symptoms. (AR 22). Second, the ALJ evaluated "the intensity, persistence, and limiting effects" of Plaintiff's symptoms to determine

"the extent to which they limit the [Plaintiff's] work-related activities," taking into consideration all types of evidence in the record. (AR 22). The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 23). To support this finding, the ALJ compared Plaintiff's testimony to the objective medical evidence and opinion evidence. (AR 22–25).

At steps four and five, the ALJ found Plaintiff capable of performing his past relevant work as well as other work existing in significant numbers in the national economy. (AR 26–27). As such, the ALJ concluded Plaintiff was not disabled. (AR 27).

## IV. DISCUSSION

In his appeal, Plaintiff argues the ALJ's decision is not supported by substantial evidence. (Pl.'s Br., ECF No. 6 at 9–19). Plaintiff advances two arguments: (1) the ALJ's findings as to his RFC were not supported by substantial evidence and (2) the ALJ erred at step five because the ALJ's finding that Plaintiff could engage in other work was not supported by substantial evidence. The Court finds Plaintiff's arguments unpersuasive, and, for the reasons that follow, the Court affirms the ALJ's decision.

### A. The ALJ's RFC Determination Was Supported by Substantial Evidence

A claimant's RFC is the most the claimant can do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). At the administrative hearing stage, the ALJ is charged with determining the claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations.") (citations omitted).

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence. (Pl.'s Br., ECF No. 6 at 9–17; Pl.'s Reply, ECF No. 9 at 2–5). Specifically, Plaintiff alleges that the ALJ failed to consider Plaintiff's obesity and history of knee replacement in his RFC determination. Plaintiff further argues that the ALJ discounted Plaintiff's persistent dizziness and lightheadedness.

*1. Obesity*

Plaintiff asserts that the ALJ failed to meaningfully consider his obesity in the RFC analysis and that this failure requires remand pursuant to *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009). (Pl.'s Br., ECF No. 6 at 11). The Court disagrees.

The ALJ considered Plaintiff's obesity throughout the decision, finding it a severe impairment at step two and explaining that it did not equal the severity of a listing at step three. (AR 19–22). The ALJ discussed Plaintiff's obesity in the RFC assessment as well, explaining that:

> In this case, none of the [Plaintiff's] treating or examining physician[s] have suggested that obesity affects the [Plaintiff's] overall condition. The [Plaintiff] remains fully weightbearing and does not have abnormal neurological or musculoskeletal functioning. Therefore, I find that the [Plaintiff's] combination of impairments, including obesity, does not meet or equal the severity of an impairment described in Appendix 1. I have fully considered obesity, pursuant to SSR 19-2p, in the context of the overall record of evidence in making the residual functional capacity determination.

(AR 21). The ALJ analyzed Plaintiff's obesity in determining Plaintiff's RFC, noting no treating or examining physician had identified additional functional limitations attributable to Plaintiff's obesity, either alone or in combination with his other impairments. As such, Plaintiff's case is unlike *Diaz*. In *Diaz*, the Third Circuit vacated the district court's affirmance and instructed it to remand to the Commissioner because the ALJ provided no analysis "of the cumulative impact of Diaz's obesity and other impairments on her functional capabilities." 577 F.3d at 504. However, the Third Circuit opined that "[w]ere there *any* discussion of the combined effect of Diaz's

impairments," it might have affirmed. *Id.* (emphasis in original). The crucial issue in *Diaz* was the absence of any meaningful discussion of the combined effects of the claimant's obesity and other impairments.

Here, the ALJ recognized that Plaintiff was noted to be obese, but that "no treatment provider has indicated that he experiences symptoms or functional limitations due to elevated weight, either alone or in combination with his other impairments." (AR 20). Additionally, the ALJ noted that Plaintiff "has not been referred for specialized weight loss treatment." (*Id.*). Obesity was never even mentioned at the hearing. (*See generally* AR 33–63). Accordingly, the ALJ's review of Plaintiff's obesity was not "wholly conclusory." *See Bryan P. v. Commissioner of Social Security*, No. 22-05496, 2023 WL 7151223, at *8 (D.N.J. Oct. 31, 2023). As such, there was no error in this regard.[2]

*2. Knee Replacement*

Plaintiff next asserts that the ALJ failed to meaningfully consider his history of total knee replacement in the RFC analysis. The Court again disagrees.

When determining a claimant's RFC, the ALJ has a duty to consider all the evidence. *Plummer v. Apfel*, 186 F.3d 422, 433 (3d Cir. 1999). When "there is sufficient development of the record and explanation of findings to permit meaningful review," the Court should not disturb the ALJ's RFC findings. *Tompkins v. Astrue*, No. 12-1897, 2013 WL 1966059, at *13 (D.N.J. May 10, 2013) (internal citation omitted).

---

[2] Relatedly, Plaintiff has not met his burden of showing that his obesity resulted in any limitations beyond those included in the RFC. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("A remand is not required here because it would not affect the outcome of the case. [Plaintiff] never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments.").

Here, the ALJ considered Plaintiff's history of total knee replacement surgery in his RFC analysis. (AR 24–25). The ALJ noted that Plaintiff had worked after his knee replacement, including at jobs involving climbing ladders and prolonged periods of standing, and had engaged in other activities inconsistent with the degree of limitation alleged. (AR 24). Plaintiff takes issue with the ALJ's consideration of notations in the medical records that Plaintiff had gone on a cruise and performed yard work. (Pl.'s Br., ECF No. 6 at 13–14; Pl.'s Reply Br., ECF No. 9 at 3). However, because the ALJ expressly considered Plaintiff's history of knee replacement in formulating the RFC and explained his findings, there is substantial evidence to support his RFC determination. While this Court may have reached a different conclusion, in making credibility determinations like this one, this Court will not substitute its own judgment for that of the fact finder. *Rutherford,* 399 F.3d at 552. There is substantial evidence to support the ALJ's finding that Plaintiff had the residual functional capacity to perform medium work subject to certain limitations and the ALJ adequately considered Plaintiff's history of knee replacement.

*3. Dizziness and Lightheadedness*

Plaintiff also argues that "there is no valid basis for the ALJ to have discounted the allegations of [Plaintiff] as to the persistent dizziness and lightheadedness." (Pl.'s Br., ECF No. 6 at 15). Plaintiff broadly asserts that these alleged impairments, if taken to be true, would not permit Plaintiff to "engage in any work activity where he had to be on his feet for the entire workday." (*Id.*). Plaintiff's arguments appear to rest on the allegation that the ALJ's decision was based on the fact that the etiology of the lightheadedness and dizziness was unknown. The Court disagrees.

Here, the ALJ compared Plaintiff's testimony regarding his symptoms with the objective medical evidence and concluded that:

> The record is also inconsistent with [Plaintiff's] allegations with regard to the frequency and persistence of the dizziness episodes. [Plaintiff] testified that he has episodes occurring three to four times per day and that can either resolve within a minute or that can last all day. During medical treatment, he said that episodes occur five times a day with some resolving in one minute and other[s] lasting up to one hour. Further, he reported in April 2023 that he was having dizzy episodes several times per day but his clinician noted that he was drinking at least a pot of coffee per day, which was likely contributing to dehydration. . . [Plaintiff] later reported reduced coffee consumption and noted that he was still experiencing intermittent episodes of lightheadedness, but that they only occurred three to four times per week. Moreover, none of his treating clinicians observed during examinations that he exhibited dizziness or imbalance.

(AR 24) (internal citations omitted). As described above, *see* Section IV.A.2, *supra*, the Court will not disturb the ALJ's RFC findings where there is sufficient development of the record to permit meaningful review. *Tompkins*, 2013 WL 1966059, at *13. There is substantial evidence to support the ALJ's finding that Plaintiff can perform medium work with certain limitations. Although the record contains evidence of Plaintiff's continued dizziness and lightheadedness, the ALJ considered that evidence, explained the inconsistencies between Plaintiff's allegations and the medical record, and imposed restrictions in the RFC to account for his impairments. Thus, contrary to Plaintiff's argument, the ALJ's decision was not based on the fact that the dizziness and lightheadedness were of unknown etiology. Accordingly, the Court finds that substantial evidence supports the ALJ's determination, and remand is not warranted on this basis.

### B. The Testimony of the VE Provided Substantial Evidence for the ALJ's Finding of Alternative Work

Plaintiff argues that there was not substantial evidence to support the ALJ's finding of alternative work available to Plaintiff. (Pl.'s Br., ECF No. 6 at 17–19). This argument largely depends on Plaintiff's contention that the RFC determination was erroneous and that any step-five finding based on that RFC was therefore necessarily flawed. (*Id*. at 17). For the reasons already discussed, however, the Court finds no reversible error in the RFC determination.

Plaintiff also points to the VE's testimony that no jobs would be available if additional limitations were accepted. (*Id.* at 19). But the ALJ was not required to credit limitations he reasonably found unsupported by the record, and Plaintiff's argument again asks the Court to reweigh the evidence, which it cannot do. *See Chandler*, 667 F.3d at 359 ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations.") (internal citation omitted).

Here, the ALJ posed a hypothetical question to the VE that adequately conveyed all of the limitations the ALJ found credible and supported by the record. (AR 57). Relying on the VE's testimony, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy. (AR 26–27). Such VE testimony constitutes substantial evidence at step five when it is based on a properly supported RFC. Accordingly, because the ALJ's RFC determination was supported by substantial evidence, and because the ALJ reasonably relied on the VE's testimony in identifying available work, Plaintiff's step-five challenge does not warrant remand.

## CONCLUSION

For the foregoing reasons, the Court **AFFIRMS** the final decision of the Commissioner. An appropriate Order will follow.

Christine P. O'Hearn

**CHRISTINE P. O'HEARN**
**United States District Judge**